IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

GREGORY L. ELIAS,

        Plaintiff,

      v.                             Civil Action No. 3:07-CV-43

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I. Introduction

A.    <u>Background</u>

Plaintiff, Gregory L. Elias, (Claimant), filed his Complaint on April 17, 2007 seeking

Judicial review pursuant to 42 U.S.C. §§ 405(g) and 1381(c)(3) of an adverse decision by

Defendant, Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer

on June 20, 2007.[2]  Claimant filed his Motion for Summary Judgment on July 20, 2007.[3]

Commissioner filed his Motion for Summary Judgment on August 20, 2007.[4]  On August 28,

2007, Claimant filed his Reply to the Commissioner's Motion.[5]

---

[1] Docket No. 1.

[2] Docket No. 5.

[3] Docket No. 8.

[4] Docket No. 9.

[5] Docket No. 10.

B.    The Pleadings

     1.    Plaintiff's Brief In Support of His Claim For Relief

     2.    Defendant's Brief In Support of His Motion For Summary Judgment

     3.    Plaintiff's Brief Reply to Defendant's Motion For Summary Judgment

C.    Recommendation

I recommend that:

     1.    Claimant's Motion for Summary Judgment be GRANTED and the case
REMANDED because the ALJ's decision to discredit Dr. Pearl's reports and opinions is not
supported by substantial evidence.

     2.    Commissioner's Motion for Summary Judgment be DENIED for the same
reasons set forth above.

## II.  Facts

A.    Procedural History

Claimant filed an application for Supplemental Security Income Benefits and Disability
Insurance Benefits on February 26, 2004, alleging disability since October 16, 2002.  His
application was initially denied on May 19, 2004 and upon reconsideration on November 17,
2004.  Claimant requested a hearing before an Administrative Law Judge, ["ALJ"], and received
a hearing on January 24, 2006.  On March 13, 2006, the ALJ issued a decision adverse to
Claimant.  Claimant requested review by the Appeals Council but was denied.  Claimant filed
this action, which proceeded as set forth above.

B.    Personal History

Claimant was 45-years-old on the date of the January 24, 2006 hearing before the ALJ.

Claimant completed high school and has prior work experience as a janitor, maintenance man, and coal equipment operator.

C.      Medical History

        The following medical history is relevant to the time period during which the ALJ concluded Claimant was not under a disability: October 16, 2002 through March 13, 2006.

**Dr. Terry L. Stake, M.D., 8-14-01 (Tr. 187)**
Impression: Normal Chest.

**Dr. Steven Miller, M.D., 8-16-01 (Tr. 188)**
Final Pathologic Diagnosis: Arthroscopic Shavings Left Knee: Fragments of Fibrocartilaginous Tissue with Degenerative Changes; Fragments of Synovium and Fibrofatty Tissue.

**Dr. Arlene Feder, M.D., 8-2-02 (Tr. 211)**
Impression: Cold intolerance, fatigue, blurred vision left eye.  Most likely the patient has an autonomic nervous system dysfunction however with the type of symptoms he has which come and go, one would have to rule out MS which I am sure Dr. Timm's examination did.  I have assessed the blood test results you sent me from July 23, 2001, thyroid testing looks normal at 1.899.  Followup from February 9, 2002, fasting glucose one half hours 120, one hour 160, two hours 104, three hours 59.  Additionally from November 12, 2001, patient had an AM cortisol value of 18.1 within normal limits, a free T4 of 1.04, also normal.  Electrolytes including sodium and potassium looked normal as well.  Both liver and kidney function were normal and hemoglobin and hematocrit were very, very slightly diminished at 13.5 and 38.7.

**Dr. Steven Timms,. M.D., 10-17-02 (Tr. 214)**
Assessment
        1. Mild bilateral ulnar sensory nerve neuropathy.
        2. Mild right carpal tunnel syndrome.

**Dr. Steven Timms, M.D., 10-8-02 (Tr. 215)**
Assessment: Normal EEG

**Dr. Henry Kettler, M.D., 10-2-02 (Tr. 217)**
Clinical Impression: Dizziness

**Stephen R. Timms, M.D., 4-22-02 (Tr. 218)**
Assessment: Vertigo, normal carotid Dopplar and MRI of the head.

**Dr. Steve R. Timms, M.D., 4-12-02 (Tr. 219)**
Impressions: There appears to be no significant stenosis in either the left or right carotid system.

**Stephen R. Timms, M.D., 3-13-02 (Tr. 220)**
Assessment: Vertigo, etiology uncertain.  I will have to rule out things such as cerebrovascular disease or demyelinating disease.

**Michael Slaysman, M.D., 4-1-02 (Tr. 222)**
Impression: Negative CT of the brain.

**Dr. Pearl, LPL, LCSW, 11-5-03 (Tr. 240)**
Diagnostic Impressions
     Axis I: 296.32, 300..81, 300.02
     Axis II: 799.9
     Axis III: Headaches, knee pain, back pain
     Axis IV: 01, 02 and 04
     Axis V: Current - 55; Estimated Prior to Work Leave - 40
Currently my patient is unable to work.  However, I expect my patient to demonstrate significant clinical improvement by 5/1/04.

**DDS Physician, 5-12-04 (Tr. 241)**
Mental RFC Assessment
<u>Understanding and Memory</u>
     Ability to remember locations and work-like procedure: not significantly limited
     Ability to understand and remember very short and simple instructions: no evidence of limitation in this category.
     Ability to understand and remember detailed instructions: not significantly limited
<u>Sustained concentration and persistence</u>
     Ability to carry out very short and simple instructions: no evidence of limitation in this category.
     Ability to carry out detailed instructions: not significantly limited
     Ability to maintain attention and concentration for extended periods: not significantly limited
     Ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances: not significantly limited
     Ability to sustain an ordinary routine without special supervision: no evidence of limitation in this category
     Ability to work in coordination with or proximity to others without being distracted by them:  moderately limited
     Ability to make simple work-related decisions: No evidence of limitation in this category
     Ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistence pace without an unreasonable number and length of rest periods: moderately limited.
<u>Social Interaction</u>
     Ability to interact appropriately with the general public: no evidence of limitation in this category

Ability to ask simple questions or request assistance: no evidence of limitation in this category

Ability to accept instructions and respond appropriately to criticism from supervisors: moderately limited

Ability to get along with coworkers and peers without distracting them or exhibiting behavioral extremes: moderately limited

Ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: not significantly limited

Adaptation

Ability to respond appropriately to changes in the work setting: not significantly limited

Ability to be aware of normal hazards and to take appropriate precautions: no evidence of limitation in this category

Ability to travel in unfamiliar places or use public transportation: not significantly limited

Ability to set realistic goals or make plans independently of others: not significantly limited

The claimant retains the capacity to understand, remember, and carry out at least 1-3 instructions within a low social interaction demand....and one with a low performance demand level. His capacity for adaptation is as rated in Section I+D.

**DDS Physician, 5-12-04 (T. 246)**

Psychiatric Review Technique

Assessment is from 10-16-02 to present

Medical Dispositions: RFC Assessment Necessary

Category(ies) upon which the medical disposition is based: 12.04 Affective Disorders, 12.06 Anxiety-related disorders, 12.07 Somatoform Disorders

Affective Disorders:

Depressive syndrome characterized by at least four of the following: sleep disturbances, decreased energy, difficulty concentrating or thinking.

A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above: Disorder _____

Anxiety Related Disorders

A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above: GAD

Substance Addiction Disorders

A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above: Somatoform d/o

Functional Limitation for Listings 12.04, 12.06, 12.07

Restriction of Activities of Daily Living: Mild

Difficulties in Maintaining Social Functioning: Moderate

Difficulties in Maintaining Concentration, Persistence or Pace: Mild

Episodes of Decompensation, each of extended duration: None

"C" Criteria of the Listings: Evidence does not establish the presence of the "C" Criteria

**Ted Ricci, MOT, OTR/L, CEAS, CHT, 6-8-04 (Tr. 260)**
Conclusions: Mr. Elias is currently demonstrating function within the Heavy Physical Demand Classification as determined through the Department of Labor based on an 8-hour workday. No significant inconsistencies or submaximal effort was noted at this time. Mr. Elias did not report any pain during lifting and carrying tasks. He did not require the use of any assistive device for ambulation. There appear to be no restrictions at this time.

**Dr. Rush, Ph.D, 6-9-04 (Tr. 281)**
Determination of emotional impairment: Upon my examination, employee failed to demonstrate significant impairment in this area.
Determination of impairment in reality testing: Upon my examination, employee failed to demonstrate significant impairment in this area.
Determination of cognitive impairment: Examination demonstrated the following significant impairments as compared to general population norms: Patient demonstrated cognitive impairment as evidenced by his WAIS III Processing Speed Index of 75% and 5% with a FSIQ of 103. This represents a significant deficit and is consistent with his complaints.
Determination of impairment in persistence, pace and stamina: Upon my examination, employee failed to demonstrate significant impairment in this area.
Determination of social judgement and impulse control: Upon my examination, employee failed to demonstrate significant impairment in this area.
Determination of impairment within activities of daily living: Within the clinical interview, the employee failed to report significant impairment in this area.
Diagnostic Impressions
       Axis I: Major dep in patient remission 296.25; cognitive disorder NOS 294.9
       Axis II: No dx.
       Axis III: Glaucoma, knee pain
       Axis IV: Stress level, mild
       Axis V: Current GAF 65; Estimated GAF Prior to Work Leave - 50

**Barbara L. Rush, Ph.D, 6-9-04 (Tr. 285)**
Independent Psychological Evaluation
WAIS-III
Verbal IQ: 102 Average
Performance IQ: 104 Average
Full scale IQ: 103 Average
Verbal Comprehension: 88
Perceptual Organization: 111
Working Memory: 115
Processing Speed: 76
There was a significant spread between the Index scores. Most notable was Mr. Elias' very low score in Processing Speed, which assesses visual processing of nonverbal abstract information and measures the speed of a motor response. This was significantly lower than all of his other skill areas, placing him in the 5th percentile, which would be considered a substantial deficit.

Subtest Scores Summary
Vocabulary: 7
Similarities: 6
Arithmetic: 12
Digital Span: 14
Information: 10
Comprehension: 14
Letter Number Sequencing: 12
Vocabulary and Similarities were significant weaknesses, tapping general vocabulary and abstract thinking. Digital Span, an immediate memory. Tests was a strength, as was Comprehension, measuring social knowledge and "common sense."

Performance Subtests
Picture completion: 14
Coding: 6
Block Design: 11
Matrix Reasoning: 11
Picture Arrangement: 11
Symbol Search: 5
Picture Completion, assessing visual attention to detail, was a strength. Coding and Symbol Search, the Processing Speed Index components, were extremely low.

21 Item Test: Mr. Elias obtained a 5 on Free Recall and a 15 on Forced Choice. This is contraindicative of malingering.

M-Fast: Mr. Elias obtained a score of 1 on this instrument. This is contraindicative of malingernig.

Diagnostic Impression
  Axis I: Major depression, in partial remission, 296.25 Cognitive disorder, NOS 294.9
  Axis II: No diagnosis
  Axis III: Per patient's report: glaucoma, knee pain, autonomic nervous system
      dysfunction
  Axis IV: Stress level: mild
  Axis V: Current GAF 65; estimated prior to work leave, 50.

Referral Questions
1) The claimant did not demonstrate emotional dyscontrol.
2) The claimant demonstrated cognitive impairment as evidenced by the significantly low score in Processing Speed on the WAIS III: 75 at the 5th percentile, with a Full Scale IQ of 103. There was no evidence of any suboptimal effort given his average to above average performance on the other subtests and his contraindicative score on the 21 Item Test.
3) The claimant demonstrated no reality testing impairment.
4) The claimant demonstrated no behavioral impairment.

**Dr. Steve Corder, M.D., 7-26-04 (Tr. 290)**
Assessment: Tolerating increase in Effexor.  Reporting steady improvements.

**Dr. Steve Corder, M.D., 6-24-04 (Tr. 304)**
Assessment: Reporting clear improvements

**Dr. Steve Corder, M.D., 5-24-04 (Tr. 305)**
Assessment: Difficulties continue.

**Dr. Steve Corder, M.D., 4-19-04 (Tr. 306)**
Assessment: Tolerating medications; having some benefits; whether his improvements are continuing or having stabilized and leveled off is not clear.

**Dr. Steve Corder, M.D., 3-23-04 (Tr. 307)**
Assessment: Tolerating Effexor, may be having some benefit.

**Dr. Steve Corder, M.D., 1-23-04 (Tr. 309)**
Assessment: Difficulties continue although I think his symptoms are much the same as his pre-treatment.  He is attributing them to problems with the medication.  It is clear it is no longer worthwhile taking the Paxil.

**Dr. Steve Corder, M.D., 9-23-03 (Tr. 311)**
Assessment: Improving but still having a great deal of difficulties functioning.  He is not able to return to work.  There are still symptom relief from the last increase was dramatic but has leveled off.

**Dr. Steve Corder, M.D., 6-23-03 (Tr. 313)**
Assessment: Improving, but is still very symptomatic.

**Dr. Steve Corder, M.D., 4-8-03 (Tr. 314)**
Assessment: Difficulties waxing and waning.  Hopefully there is some improvement in there.

**Dr. Steve Corder, M.D., 2-10-03 (Tr. 317)**
Assessment: He is showing slow, but steady improvement.

**Dr. Steve Corder, M.D., 1-10-03 (Tr. 319)**
Assessment: Improved, but not in remission.

**Dr. Steve Corder, M.D., 12-10-02 (Tr. 321)**
Assessment: He seems to be having a good initial response to Paxil CR.  He is at least tolerating it.

**Dr. Steve Corder, M.D., 11-26-02 (Tr. 323)**
Assessment/Diagnostic Impression:

Axis I: Major depression mild recurrent; Obsessive compulsive disorder versus generalized anxiety disorder. Somatization disorder. I think the degree of this although related to the above two is in excess of what could be attributed either by itself. Would even consider delusional disorder, somatic type. I will go ahead and make note here, however, that it is still quite possible that there is an undetectable disorder such as multiple sclerosis that could become more evident later on. Our focus is going to have to be getting away from his concern of what is wrong with him, but more what he can, will and do about it rather than what is wrong, and how to live as healthy and happy a life as possible. Consider adult form of ADHD.

Axis II: Consider obsessive personality disorder.

Axis III: Autonomic nervous system dysfunction.
　　　　Hiatal hernia repair.
　　　　Headaches.
　　　　Glaucoma.

Axis IV: Inability to work.

Axis V: 31


## Pearl, MRC, LPC, LCSW, 4-30-03 (Tr. 347)

<u>Summary and Impressions</u>: This is a 42 year old man who presents with myriad of physical complaints. He is a quiet guy. He is a off work due to being unable to keep up. He slowed down at work and even driving but he doesn't know why. His goals are: 1) better health, 2) own my home, 3) retire at 55, 4) keep an eye on his nephews. It is his therapist's hunch that Mom's death and some type financial struggle surrounding her estate "kicked off" his depression and his symptoms were manifested physically - depressive equivalents if you will - knee pain, blurred vision, back pain, migraines.

Provisional Diagnoses

Axis I: 296.32: major depressive disorder, recurrent, moderate.
　　　　300.81: somatoform disorder.
　　　　300.02: generalized anxiety disorder.

Axis II: 799.4: r/o personality disorder

Axis III: Recurrent headaches; chronic pain (knee, stomach, back)

Axis IV: Problems with primary support group - siblings are not supportive.
　　　　Problems related to the social environment - doesn't have close friends outside work
　　　　Occupational problems - off work, disabled.

Axis V: GAF 51 (current)


## Dr. Terry Elliot, M.D., 9-13-04 (Tr. 354)

Summary: Physically, Mr. Elias seems to be significantly improved and potentially physically he is capable of returning to most of his regular activities at work. The one item that has been holding him back for the last several months is that of his anxiety and depression. If you desire further information or insight into his treatment and projected return to work date in regard to his

severe depression and anxiety then you will need to contact his psychiatrist Dr. Stephen Corder.

**Dr. Elliot, 3-13-03 (Tr. 364)**
Spoke to Dr. Corder in regards to Mr. Elias.  He thinks he is improved but not sure he is ready to return to work at this time from his ..... point.  I related that I think he has improved physically over the past few months.

**Dr. Jasmine Trouten, M.D., 1-16-02 (Tr. 385)**
Impressions:
>    1) Negative stress EKG for significant ischemia
>    2) No chest pain induced.
>    3) Excellent exercise capacity for age (13 METS)
>    4) Physiologic blood pressure response to stress
>    5) Await echo report.

**Dr. H. David Millit, M.D., 1-17-02 (Tr. 387)**
Impressions: Probable normal stress echocardiogram.

**Dr. H. David Millit, M.D., 1-17-02 (Tr. 387)**
Impressions
1) The left ventricular chamber size appears normal. Left ventricular wall thickness is somewhat difficult to define, appears normal. Overall left ventricular systolic function appears somewhat sluggish and at lower limits of normal to mildly decreased.  Visually estimated LVEF at times appears in the range of 45-50%.  Right ventricular chamber size appears normal to upper limits of normal.  Right ventricular systolic function appears normal.
2) Aortic leaflet excursion appears normal.
3) No evidence of mitral stenosis or significant valvular prolapse is identified.
4) The tricuspid valve appears normal.
5) The pulmonic valve is not adequately visualized.
6) Left atrial size appears normal to upper limits of normal.  Right atrial size appears normal to upper limits of normal.  Aortic root dimension appears normal.
7) No evidence of significant pericardial effusion is identified.
8) The inferior vena cava appears dilated, suggesting increased right atrial pressure.

**Dr. Beatrice H. Muglia, M.D., 1-19-01 (Tr. 408)**
Diagnosis: Hernia Sac, Left Inguinal.

**Dr. Michael Slaysman, M.D., 3-16-01 (Tr. 416)**
Impression: Negative orbits for metallic foreign body.

**Dr. Michael Slaysman, M.D., 4-10-01 (Tr. 417)**
Impression: Positive effusion and slight degenerative change with no other definite abnormality appreciated.

**Wheeling Hospital Radiology, 5-8-01 (Tr. 418)**
Impression: 1) Large tear of the posterior horn of the medial meniscus associated with a large joint effusion; 2) Strain of the medial collateral ligament.

**Dr. Thomas Neis, M.D., 9-21-01 (Tr. 419)**
Impression: Normal barium swallow

**Wheeling Hospital Radiology, 9-21-01 (Tr. 420)**
Impression: Normal upper intestinal series; normal small bowel series.

**Dr. Mark Benson, M.D., 9-21-01 (Tr. 421)**
Impression: Normal appearing gallbladder.

**Dr. Mark Benson, M.D., 9-21-01 (Tr. 422)**
Impression: Normal CT scan of the abdomen and pelvis.

**Dr. Gary Loh, M.D., 12-27-01 (Tr. 423)**
Impression: No acute infiltrates or change since 8/13/01.

**Dr. Mark Benson, M.D., 12-26-01 (Tr. 424)**
Impression: Left ventricular ejection fraction of 54.7%.

**Dr. Terry Stake, M.D., 3-6-01 (Tr. 425)**
Impression: There are focal degenerative changes at the C5-6 level with bilateral C5-6 neural foraminal narrowing.

**Wheeling Hospital Radiology, 2-24-04 (Tr. 426)**
Impression: Normal gallbladder ultrasound; normal liver ultrasound.

**Dr. Thomas J. Schmitt, M.D., 10-4-04 (Tr. 437)**
Summary, evaluation and impression: History of anxiety and depression is responding well to medication.

**Dr. Lawrence Burstein, Ph.D., 8-10-04 (Tr. 455)**
Diagnosis(es): Chemical imbalance/depression/Osteoarthritis of the knees.
Determination: Fails to support functional impairments that preclude work through the entire time period.

**Dr. Lawrence Burstein, Ph.D., 8-6 -04 (Tr. 458)**
Determination: Fails to support functional impairment(s) that preclude work through the entire time period.

**Dr. Tamara Bowman, M.D., 3-3-04 (Tr. 460)**
Diagnosis(es): Depression, Anxiety, Knee pain, Dizziness.

Determination: Fails to support functional impairment(s) that preclude work through the entire time period.

**DDS Physician, 11-2-04 (Tr. 468)**
Mental RFC Assessment
Understanding and Memory:
> Ability to remember locations and work-like procedure: not significantly limited
> Ability to understand and remember very short and simple instructions: not significantly limited
> Ability to understand and remember detailed instructions: not significantly limited

Sustained concentration and persistence
> Ability to carry out very short and simple instructions: not significantly limited
> Ability to carry out detailed instructions: moderately limited
> Ability to maintain attention and concentration for extended periods: moderately limited
> Ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances: not significantly limited
> Ability to sustain an ordinary routine without special supervision: not significantly limited
> Ability to work in coordination with or proximity to others without being distracted by them: moderately limited
> Ability to make simple work-related decisions: not significantly limited
> Ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistence pace without an unreasonable number and length of rest periods: moderately limited.

Social Interaction
> Ability to interact appropriately with the general public: not significantly limited
> Ability to ask simple questions or request assistance: not significantly limited
> Ability to accept instructions and respond appropriately to criticism from supervisors: moderately limited
> Ability to get along with coworkers and peers without distracting them or exhibiting behavioral extremes: moderately limited
> Ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: not significantly limited

Adaptation
> Ability to respond appropriately to changes in the work setting: not significantly limited
> Ability to be aware of normal hazards and to take appropriate precautions: not significantly limited
> Ability to travel in unfamiliar places or use public transportation: not significantly limited
> Ability to set realistic goals or make plans independently of others: not significantly limited

Limitations are noted on part of RFC which place moderate restrictions on the social domain. These limitations do not meet or equal a listing. MER notes good progress.... Based on ... MER he is able to perform ARL's independently and follow ... in a low stress setting.

**DDS Physician, 11-2-04 (Tr. 473)**

Medical Dispositions: RFC Assessment Necessary

Category(ies) upon which the medical disposition is based: 12.04 Affective Disorders, 12.06
      Anxiety-related disorders, 12.07 Somatoform Disorders

Affective Disorders: A medically determinable impairment is present that does not precisely
      satisfy the diagnostic criteria above: Major depressive disorder.

Anxiety Related Disorders: A medically determinable impairment is present that does not
      precisely satisfy the diagnostic criteria above: Anxiety Disorder

Functional Limitation for Listings 12.04, 12.06, 12.07
      Restriction of Activities of Daily Living: Mild
      Difficulties in Maintaining Social Functioning: Moderate
      Difficulties in Maintaining Concentration, Persistence or Pace: Mild
      Episodes of Decompensation, each of extended duration: None

"C" Criteria of the Listings: Evidence does not establish the presence of the "C" Criteria


**DDS Physician, 11-6-04 (Tr. 487)**

Physical RFC Assessment

Exertional Limitations: None established

Postural Limitations: None established.

Manipulative Limitations: None established

Visual Limitations: None established

Communicative Limitations: None established

Environmental Limitations: None established


Patient is partially credible, allegations are only partially supported by findings. All considered.
RFC not affected.


**Dr. Steve Corder, M.D., 4-1-05 (Tr. 496)**

Assessment: Seems to be improving. Working diagnosis continues to be depression and probably
Obsessive Compulsive Disorder versus atypical psychosis and some consider for rapid cycling
bipolar disorder.


**Dr. Steve Corder, M.D., 1-3-05 (Tr. 498)**

Assessment: Doing well, difficulties continue


**Dr. Steve Corder, M.D., 8-16-05 (Tr. 539)**

Assessment: He's more at ease, less symptom stress, overall improving.


D.      Testimonial Evidence

      Testimony was taken at the January 24, 2006 hearing. The following portions of the

testimony are relevant to the disposition of the case.

Q       Okay. Mr. Elias. How old are you?

A       45.

Q       And you have a high school education, right?

A       Yes, sir.

                    *                    *                    *

Q       Okay.  But the last job as equipment operator, what were the circumstances of you leaving in '02?

A       I was having vision problems and I brought it to the attention of my foreman and she talked to her boss and they immediately put me on a day turn shift because at the time we would work afternoons and day turns and sometimes we'd run equipment after dark on the afternoon shift, heavy equipment and -

Q       Uh-huh.

A       -- you know, I was getting to where I couldn't see too good and I was concerned for myself or somebody else so they put me on the daylight shift. there and, at the time, Dr Elliott, my family doctor was trying to -- he was sending me for tests to try to find out what was going on  --

Q       Uh-huh.

A       -- and I went about six months on the light duty job and finally I was having a lot of headaches and having a lot of pain and, of course, Dr. Elliott wanted me to keep working at the time.

Q       Uh-huh.

A       I told him I thought I should go off work and he thought it was in my best interest to keep working because they hadn't figured out what was wrong yet and he -- the day -- they gave me a job that required a lot of walking in that particular job, that particular day --

Q       Uh-huh.

A       -- and I was having a lot of pain and I refused to do it.

Q       And that was your last day?

14

A       Yes.

                              *                *                *

Q       Your height and weight, sir?

A       6'1". 195 pounds.

Q       And marital status?

A       I'm single.

Q       Have you lived alone or with somebody?

A       I live alone.,

Q       In what kind of structure, a house, apartment?

A       Apartment.

Q       And that's in Glen Dale?

A       Yes, sir

                              *                *                *

Q       Are you left or right-handed'?

A       Right.

Q       And do you drive?

A       Yes, uh-huh.

Q       How many miles are you driving typically in a week, do you think?

A       60. I'd just guess maybe 60.

Q       Where might you go?

A       I try to do a lot of things for two of my nephews.  I live in Glen Dale, probably -- usually to

Wheeling or Moundsville usually so --

Q       Uh-huh. What do you do for them?

A       Well, they're in high school, both of them, and their parents, my sister is kind of, has a bipolar

disorder and --

Q       Uh-huh.

A       – neither one of them work and I try to help them out the best I can.  They live with their grandparents for the most part and they're up in years.

Q       So does this mean you take them places or you --

A       Right..

Q       -- help at their house or what is the reason for helping? I mean, I know the reason for helping the nephews but what do you do, what do you mean by that?

A       I worked on their shower, the washing machine. They play sports, you know, like before the oldest one had his license, I would drive them here and there, pick them up, so forth, take them to buy clothes, stuff like that.

Q       Okay. Do you -- have you applied for any work, Mr. Elias, since you left American Electric?

A       No, uh-uh.

Q       And the, Mr Cogan gave me these Ohio State Highway Patrol safety reminders.  Were they related to daytime driving?

A       No.  Both of them was evening driving, both after dark..

Q       Okay.  And what were the reasons?

A       They said I was weaving in marked lanes, out of the marked lanes.

Q       Uh-huh.

A       Them two was on Interstate 1-470.

Q       Okay. And do you think that relates to your condition, the weaving?

A       Yeah.  They think I'm, most definitely, they think I've been drinking. That's what --

Q       Uh-huh.

A       -- they pulled me over for. They tell me that, you know, first thing --

*                *                *

[EXAMINATION OF CLAIMANT BY ATTORNEY] (Tr. 595)

16

Q        Are these the only times you've been pulled over?

A        No, no.  I've, I have eight, total.  One, I was still working when one of them, I was pulled over, coming home from work on the afternoon shift.

Q        And these are all instances when you were weaving?

A        Right.  They said I was, yes.

Q        You didn't think you were?

A        I was doing the best I could and I just, you know, I didn't believe I was in -- I was in my lane. I believe that, yes, but they say I'd go on the lines, white lines, stuff like that --

Q        Okay.

A -      - that's what they've said.

Q        And on none of these occasions were you drinking?

A        No.

Q        And the most recent one'?

A        Yeah. I got pulled over. It was last Sunday or Monday night, last week.

Q        Okay.  Now, we described, excuse me, a number of problems that you have. One is the coordination impairment but there are a bunch of other ones. For example, the headache, light-headedness when you get up, knee pain, hernia pain and vision. Are those better or worse?

A        They're better since -- now than I when I first went off work

Q        Okay.  So they were worse when you were working?

A        Yes, definitely.

Q        Okay. Now, when you were younger, you used to be very active?

A        Right, yes.

Q        Okay.  You ran?

A        Oh, yeah. I loved to run. I raced motorcycles for about three years in my late teens.

Q        Now tell us about how the coldness affects all these conditions that you have.

A       Okay.  When I, the best example, I remember I gave blood for something there at [INAUDIBLE] Hospital one time and the girl that took my blood, she made a comment that I had these giant veins in my hand, it was easy to find a blood vessel and they was like construction worker type veins. I remember she said that but it's like that was probably when I was feeling normal and now, when I get in these cold spells that I talk about all the time, that's when the pain comes.  That's when, if I'm cold for 16, 24 hour period, that's when I normally get the headaches and it just seems like all my problems that I complain about are worse when I'm in this cold state that I keep talking about.

Q       And how often are you in this cold state?

A       Right now, probably 3/4 of the time --

Q       Okay.

A       -- of every day

Q       Now, when you went to see -- we just. talked about this – when you went to see Dr. Elliott, he took your temperature and it was low but what I would think of as not abnormally low, 97.

A       Right

Q       Did he explain the coldness versus a relatively normal temperature?

A       No. I really got the impression that they haven't run into this very often.,

                          *               *               *

[Q       Do you think that this coldness relates to the autonomic nervous system disorder?

A       Yes.

Q       Okay.

A       Yes. And adrenalin system that we was talking about earlier.

Q       Okay.

A       The medication I'm on is for it.

Q       And when the veins in the back of your hand, when those get big, that's a sign to you that warmth is coming back in your body and the coldness is going away?

A    Correct.

Q    Okay.

A    I can even feel it.

Q    Okay.  You can feel it go through your body'?

A    Right.

Q    Okay. And that's good? The heat is good'?

A    Yes, yes.

Q    Okay.

A    Definitely.

Q    Now you also indicated that, at least to Dr. Corder., that you thought you could feel some medications working in your brain or in your skull

A    Right, yes.

Q    Could you tell us about that, please?

A    The -- I checked, I've been on this Effexor medicine from March of 2004, okay.  I''m on the highest dosage.  Dr. Corder says the manufacturing recommends he don't want to go no higher and I've been on the highest dosage since September of '04.  Okay. And, even up until, you know, now, I still have it where something is working in my head from the medicine and there's times that it's affected me to where I can't even hold my head up. It will even, I have to take the time to let it do whatever it's doing and that it allows me to just do just basic normal functions, you know, just like showering or even reading a newspaper or something but, you know, it could happen on any day.  I have no -- there's no pattern of what, when it does it or -- but it's usually in the morning.  Usually, when I first get up is when -- the first half of the day is when it's the most noticeable and, as the afternoon goes on, you know, that's when I can start doing things for the most past.  The worst it's been is it's affected me, I believe, until 8:30 at night was the longest that I can remember before I could actually do something besides eat. I mean, I do eat but it's quite, you know, works on me, you know, on my functions pretty good.

Q      This is the medicine? When you feel the medicine working in your head, you have problems doing anything'?

A      Yes.

Q      Okay.

A      Yes, uh-huh.

Q      Okay.  Now, you -- they talk about slowness, that you do things very slowly and that's improved a little bit since you stopped working?

A      Yes.  The driving, my driving has gotten much better and it continues to, you know, to this day, progress better and better.

Q      You had problems at work with your fellow employees when you were working because of the slowness?

A      Yeah.  They thought, see, at the time, I didn't know what was wrong and nobody else did either and they, I guess, thought I was lollygagging or lazy but that was not the case whatsoever. It goes back to like I was doing the best I can, 1ike I just said earlier with my driving, you know, I don't do anything different now than I did then but my functions are much better.  You know, they're, they've improved, like I said, since I went off work.

                     *              *              *

Q      Well, this pain you get when the coldness comes over you, I understand that it worsens these other things, the knee pain that you would have from your knee surgery?

A      Right.

Q      Your hernia pain related to your hernia surgery'?

A      Right.

Q      How bad is the pain'?

A      Well, once again, I refer like in the beginning when I went off work, a lot of it was around my hernia area, like if I lift something that had any weight to it and, for the most part, that has gotten past

20

that. Now, usually when I have pain, it will be in the knee, my feet, the leg area. That's where most of the pain was.

Q      Now, you had some numbness in your hands when you were tested three years ago, remember that?

A      I remember we talked about that there.

Q      And they said you had nerve neuropathy, mild carpal tunnel. Do you remember that?

A      I remember the mild carpal tunnel on one of the tests I had taken through Dr Elliott, yes.

Q      Okay. And they indicated that using your fingers, you could do that but only occasionally. Do you remember that?

A      I just remember --

Q      Okay.

A      - - about carpal tunnel

Q      Why do you think you're unable to work?

A      Well, for, you know, you tell somebody, you know, it's like working with American Electric Power. You know, they expect you to be there at a certain time, on your shift, and you can only be late so many times and you need doctor slips and all along through my treatment process, most of my problems are greatest in the first half of the day, in the morning hours and, like I said, I don't think if I was to work say for American Electric Power again, I don't think it would take me very long before I would probably be in some kind of mess as far as being late for work or missing work because of some of the things I've just, the medicine reactions, the pain, the headache parts, it's not even gotten to a consistent point. to where I can tell you what it's going to be like even tomorrow morning when I wake up.

Q      Okay. Now, it's fair to say, is it not, that you're withdrawn socially?

A      It's gotten better, once again, but, yes, I -- when you have, when you're driving slow on the road, you make a lot of enemies and people at work was not very happy with me and, yes, I think it's just a common, pretty obvious thing to withdraw, yes.

Q       Do people come visit you?

A       I'm -- yeah, occasionally, yes.

Q       Okay.

A       Usually my family members.  I have brothers and sisters,

Q       Okay.

A       But when I'm doing things, I'm usually around my nephews.  I'm usually at their house. That's for most part when I'm doing stuff.

Q       How often do you get these headaches that you complain of?

A       I had one this morning when I got up. Right now, I have them about once every week and ½, two weeks, probably, you know, that's the best I can tell and they usually last about two days right now.

Q       And how severe are they?

A       They're very -- I have them to where I can't even, sometimes, not all the time, but I've had them where I can't even sleep to get away from them.  Like I've been up most of the night, up and down, trying to, you know, I take aspirin, I try to -- I put ice on my head I put heating pads on my head.  I try to elevate my head but they can get pretty severe.  I mean - -

                    *               *               *

 Q      And we talked about when you get up sometimes, you have, not dizziness exactly but light-headedness'?

A       Right, yes. At the present time, yes.  If I get up and I've been in a seated position for 10 minutes or so, yes, I can have a light spell, just nothing major, just something that I have to stand and, you know, catch my bearings there, you know, but it's and then can go on.

                    *               *               *

[RE-EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE]  (Tr. 604)

Q       Mr Elias, have you been under treatment for depression and anxiety by Dr Corder?

A       Yes, sir.

Q       Are you still under his care'?

A       Yes, sir.

Q       Okay.  And how is that going'?

A       Oh, I'm happy with Dr. Corder. The first, from 2002 to the beginning of 2004, he had me on Paxil medicine and he was above the limit for that, he told me, the manufactured recommendation and it was 60 milligrams was the recommendation. I was just starting, I believe, 85 and I started to have a bad affect from it. They told me it was like a poisoning affect, like a reverse affect --

Q       Uh-huh.

A       -- and he, I went in and seen him. He took me off of it for a month to let it get out of my system and then he put me on this Effexor medicine that I'm on now and I believe that was March of '04 to present that I've been on this Effexor medicine,.

Q       Okay. And how often do you see him'?

A       Well, I haven't seen him presently since August, I believe it was 15th of last year, but what we -- most of the time, he would, we would go between two months -- in the beginning, it would be one month, as we moved up the ladder with the medicine but generally here it's been two to three months and, in August, he wrote me a, he would on1y give me so many refills --

Q       Uh-huh.

A       -- on my prescription and this last time, he gave me a six-month refill so, as long as the medicine, I don't feel, you know, that it's not leveled off or anything, I'll continue to use it until my refills probably run out

Q       Okay.  Do you see a counselor or anything like that or was it just you and Dr. Corder?

A       No. Dr. Corder recommended that I go to at least six weeks, it was six or nine weeks of counseling in the beginning.

Q       Uh-huh.

A       -- and that was probably six months after I'd seen him. He brought up the counseling and I went to this Dr. Pearl, William Pearl and I still continue to see him today which is approximately two and ½ years later.

Q       And he's a counselor?

A       Yes, sir.

Q       Okay. The -- now your knee surgery, when was that? Was that in just the past --

A       It was in August of 2001.

Q       Okay.  And you went back to work after that?

A       Yes, uh-huh.

Q       The headaches are did you say once every one and ½ weeks and they last two days?

A       Right now, presently, that's about --

Q       Okay.

A       - - as close as I can --

Q       So when you have them on those two days, a couple of times a month, that's like four days or so, are you like -- do you have to stay home? Do you have to lie down?

A       Yes, sir. Yes. I'd asked, aside from the headaches, I'd asked Dr. Corder for pain medicine the first two visits of '05 and he did not want to give me pain medicine. He must have wanted me, he must wanted the medicine to do its work because I asked him on January and in, I believe, it was April --

Q       Uh-huh.

A       -- and, because I was having a lot of pain and he does, he would not give me pain medicine.

Q       How did you spend your day yesterday, just to give me an idea? What time did you get up?

A       I'm up usually between 5:00 and 6:00 every morning I mean, I just naturally wake up at that time I don't set the alarm or anything.

Q       Uh-huh.

A       Try to remember what I did do. I went through some of these notes here at home in the afternoon.

Q       Uh-huh.

A       I went somewhere, if I can remember where I went, in the morning I can' t even remember where

- -

Q       That's okay, If you don't remember, that's -- did you went out, you think, once?

A       I was at my nephews in the afternoon, evening part, I done a little bit of stuff there for them.

Q       What did you do yesterday for them?

A       They -- I hadn't been with them all weekend basically. I wasn't feeling that well and I was just, I

helped take out garbage for the grandparents, that type of thing --

Q       Uh-huh.

A       -- helped with the kids, you know.

Q       Uh-huh.

A       They had friends over for the Steeler game and that sort of thing I just try to help them with the

kids.

Q       Uh-huh. Do you go to any ballgames yourself'?

A       Over the weekend, you know, or just period?

Q       In general?

A       In general'?

Q       Over the last three years'?

A       Maybe two or three a year, basketball games, football games I did go to the kids' football games.

Q       Uh-huh.

A       -- in the fall, yes.

                        *                *                *

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]  (Tr. 609)

ALJ:    Okay. Assume a younger individual with a high school education, precluded from performing all but light work, that entails no hazards or climbing, no temperature extremes, because of the knee, a sit/stand option, and due to mental health treatment, unskilled, low stress, defined as one and two-step processes, routine and repetitive tasks, primarily working with things rather than people, entry level. With those limitations, can you describe any work?

                        *                   *                   *

VE:     All right.  Falling within the hypothetical, as given, work as an inserting machine operator.  There are 80,000 nationally, over 300 regional, cleaner polisher, 95,000 national, region 800, garment folder, 80,000 national, 300 regional.

ALJ:    Are those jobs consistent with the Dictionary of Occupational Titles?

VE:     Yes, sir.  Taking into account with a sit/stand option, I'm utilizing my own experience along with other reference material that looks at the DOT as a reference.

ALJ:    Mr. Elias testified he has severe headaches about every week and ½ that lasts two days which would total over five days of absences if they occurred on workdays. What is the tolerable level of absenteeism?

VE:     Well, if a person would miss more than two days a month consistently, they're not going to be long in any of these positions. They would end up getting fired.

                        *                   *                   *

[EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY] (Tr. 611)

Q       The - - if the ability indicated at 9F/21, which would be fingering, bilateral fingering only occasionally, would that have an affect on these jobs?

A       Okay. Does it also -- how does that affect a person's ability to grip? Sometimes they

26

categorize them together. Sometimes they separate them.

Q       I think it's separated.

A       Okay.

Q       I think -- well, for the purpose of this, just assume a normal grip strength.

A       Normal grip strength?

Q       Uh-huh, please.

A       I would say that, with a normal grip strength, the cleaner polisher and inserting machine operator would not be affected.  Garment folder would be because there are times when the person is responsible to button the buttons in the different garments that are involved.

Q       Now, when -- you gave a response to the sit/stand option.

A       Uh-huh.

Q       Is there is orthostatic light-headedness, would that limit the ability to perform the sit/stand option?

A       Depends how it affects the individual and the reason I say that, there's some people who get light-headed and they just go on and has little affect.  If it got to the point that he was light-headed and he had to throw up, yes, that would prevent his ability to do sit/stand option. It all depends on how it affects him and how much time it takes him off task because of the light-headedness.

Q       Would, in a hypothetical situation, would you believe that a person who showered every three days would have some problems performing substantial gainful employment in proximity with others?

A       In proximity of others? Working with the general public, absolutely.  As a laborer, such

as a cleaner polisher, that's not going to matter, you know.  Inserting machine operator, yes, that would matter because you're working in an office environment.  Garment folder, there are occasions that you are in proximity of other people so it would affect two of them if the person stunk, in other words.

*          *          *

[CONTINUED EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY] (613)

Q       Do all of these jobs that you've described presuppose someone with an average working speed?

A       Okay.  In time management, what you look at is a person's ability to perform at pace, a least 45 minutes for the hour during a job. Now, the exception, when they're working with the public, such as a cashier, they may actually be doing a pace of the entire hour for every hour during the work site. But, for these type of jobs, 45 minutes minimal pace so that means that they're producing at least 45 minutes of work for every hour.  If it's below that, then it's not considered competitive employment. That's when you get into the sheltered workshops and protected work environments.

Q       Okay.  If you had someone whose actions, let's say most of the average day, were quite slow and he had, resulting in impaired speed, would that affect his ability to perform these jobs?

A       Well, you're not doing assembly work. What becomes an issue is how much off task he's going to be and whether he can meet that pace or not.  There are people that are slow and there are people that, you know, can't meet the pace because they're slow.  Without getting an idea of how slow that individual is, you know, that's why we look at a pace in time management.

Q       Well, does it assist you in any way to learn that the psychologist indicated that

28

completing the clinical insurance forms took a long time?

A    That's paperwork.

Q    Okay.

A    This isn't.

Q    Okay.

A    And, paperwork, some people are nervous with so it's an intrinsic thing.  For each individual, it's different.

Q    Okay.  Did this presuppose, these jobs presuppose an average, a person of average coordination?

A    I would say yes.

Q    So a person with impaired coordination, that would compromise the ability to perform these jobs?

A    It compromises most jobs, yes, sir.

E.    Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect his daily life.

• Able to attend to his personal needs and grooming.  (Tr. 82)

• Prepares foods such as cereal for breakfast and sandwiches and microwaveable things for dinner.  (Tr. 82)

• Eats out.  (Tr. 82)

• Performs the following work around the house: vacuuming, dusting furniture, paying

bills, washing dishes, managing bank accounts, running errands, taking out the trash. (Tr. 82)

- Shops for food, clothing, medication, newspapers.  (Tr. 83)

- Reads three newspapers per week.  (Tr. 83)

- Watches television three hours per day.  (Tr. 83)

- Attends sporting events and movies and church.  (Tr. 84)

- Visits nephews daily.  (Tr. 84)

- Leaves house on daily basis.  (Tr. 84)

- Lives alone.  (Tr. 593)

- Drives 60 miles per week from Glen Dale to Wheeling and Moundsville to care for

- nephews.  (Tr. 594)

- Helps care for two nephews by driving them to and from locations and taking them to buy clothes.  (Tr. 594)

- Helps repair shower and washing machine and mother's house.  (Tr. 594)

- Takes Effexor since September 2004.  (Tr. 599)

- Showers once every three days.  (Tr. 600)

- Has family members visit the house occasionally.  (Tr. 602)

- Gets up in the morning between 5:00 and 6:00 a.m.  (Tr. 607)

- Helps take out garbage for his parents.  (Tr. 607)

- Attends 2-3 sports games a year.  (Tr. 608)

- Reads the mail or the paper during the day.  (Tr. 609)

### III.  The Motions for Summary Judgment

30

A.     Contentions of the Parties

Claimant alleges the ALJ erred in his factual findings; failed to properly consider all the relevant medical opinions; failed to consider all of Claimant's limitations when determining Claimant's RFC and when citing the hypothetical to the Vocational Expert ["VE"], failed to properly credit Claimant's subjective limitations.  Commissioner contends the ALJ's alleged "error" in his factual findings is harmless; the ALJ  properly considered the medical evidence; the ALJ properly determined Claimant's RFC and gave a proper hypothetical; the ALJ properly determined Claimant's subjective limitations were not credible.

B.     The Standards.

1.     Summary Judgment.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56©.  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial."  Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.     Judicial Review.  Only a final determination of the Commissioner may receive

judicial review.  <u>See</u>, 42 U.S.C. §§ 405(g), (h); <u>Adams v. Heckler</u>, 799 F.2d 131,133 (4th Cir. 1986).

  3. <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears the burden of showing that he has a medically determinable impairment that is so severe that it prevents him from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. §§ 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

  4. <u>Social Security - Medically Determinable Impairment</u>.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. §§ 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

  5. <u>Disability Prior to Expiration of Insured Status- Burden</u>.  In order to receive disability insurance benefits, an applicant must establish that he was disabled before the expiration of his insured status.  <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

  6. <u>Social Security - Standard of Review</u>.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

  7. <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently

explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

        8.     Social Security - Substantial Evidence - Defined.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

        9.     Social Security - Sequential Analysis.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have listed impairments but cannot perform his past work, the burden shifts to the Secretary to show that the claimant can perform some other job.  Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.     Discussion

        1.     Whether the Case Should be Remanded Due to An Inconsistency in the ALJ's Decision.

Claimant alleges that the case must be remanded because the ALJ failed to list his "status-post knee surgery" impairment in his "Findings."  As accurately noted by Claimant, the ALJ

stated in his discussion that Claimant had the following severe impairments: "headaches, S/P left knee surgery, depression and anxiety." (Tr. 21). In his "Findings," however, the ALJ stated, "[t[he claimant's headaches, depression and anxiety are considered 'severe'" and omitted mention of Claimant's "status-post knee surgery." (Tr. 24). Commissioner argues the latter omission is harmless because the ALJ considered the impact of Claimant's knee impairment on his RFC, despite failing to reference Claimant's knee impairment in his formal "Findings." This Court agrees with Commissioner and holds that the ALJ's omission is harmless in light of the ALJ's well-articulated consideration of Claimant's knee and its impact on Claimant's ability to work.

As evidenced by the ALJ's decision, the ALJ carefully considered the medical evidence, which established that Claimant's knee did not impose any significant limitation on his ability to work. For example, Dr. Schmitt's October 2004 evaluation of Claimant noted Claimant's full range of motion. (Tr. 439). Similarly, the Claimant's June 2004 Functional Capacity Evaluation concluded "there are no restrictions at this time." (Tr. 260). Furthermore, Dr. Elliot's report dated September 2004 established that Claimant's physical impairments, including his knee, do not preclude him from returning to work. (Tr. 354). Despite the medical evidence establishing that Claimant's knee did not impose any limitations, the ALJ nevertheless included a "sit/stand" option in Claimant's RFC which more than sufficiently accounted for any knee-related limitations. For these reasons, this Court finds the ALJ's omission in his "Findings"to be harmless error. The situation here is closely analogous to that found in <u>Diorio v. Heckler</u>, 721 F.2d 726 (11th Cir. 1983). In <u>Diorio</u>, the ALJ there stated the claimant "was closely approaching advanced age," when in fact the Regulations characterized him as "closely approach[ing] retirement age." <u>Id.</u> at 728. The <u>Diorio</u> ALJ also considered work he should not have. <u>Id.</u> The

34

Court held the errors to be harmless errors because the errors did not affect the outcome of the case.  Id.

2. Whether the ALJ Failed to Give Proper Weight to Medical Opinions.

Claimant argues the ALJ failed to give proper weight to the opinions of Drs. Feder, Timms, Pearl and Coder.  Specifically, Claimant argues the ALJ ignored Drs. Feder's and Timms' opinions, unreasonably rejected Dr. Pearl's opinion, and misconstrued Dr. Corder's opinion.  Commissioner argues the ALJ properly considered the opinions of the doctors.

When evaluating the medical evidence, a treating physician's opinion will be entitled to controlling weight under some circumstances.  The opinion must be (1) well supported by medically acceptable clinical and laboratory diagnostic techniques and (2) not inconsistent with other substantial evidence in the case record.  20 C.F.R. § 416.972(d)(2).  A treating physician's opinion will be disregarded if persuasive contrary evidence exists.  Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984).  To decide whether an impairment is adequately supported by medical evidence, the Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); 20 C.F.R. § 404.1508;  Heckler v. Campbell, 461 U.S. 458, 461 (1983); Throckmorton v. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990).  Regardless of a physician's opinion, the ultimate legal determination of Claimant's impairments and disability remains with the Commissioner and a medical source opinion on such a determination is not entitled to controlling weight.  20 C.F.R. § 404.1527(d)(2); (e)(2); SSR 96-5p (1996); McLain v. Schweiker, 715 F.2d 866, 869 (4th Cir. 1983).  The ALJ must still, however, evaluate all the medical evidence to determine the extent to which the opinion is supported by the

record.  SSR 96-5p.  Ultimately, the ALJ's findings as to all medical opinions will be upheld as long as substantial evidence supports them.  Hays, 907 F.2d at 1456.

Dr. Pearl, a licensed clinical psychotherapist, first saw Claimant April 2003.   On that occasion, he diagnosed Claimant with major depressive disorder, somatoform disorder, generalized anxiety disorder and assigned Claimant a GAF of 51.  (Tr. 347).  He noted that Claimant was working with Dr. Corder to relieve his depression and chronic worrying so as to be able to return to work.  (Tr. 347).  In November 2003, Dr. Pearl again diagnosed with Claimant with major depressive disorder, somatoform disorder, generalized anxiety disorder and assigned Claimant a GAF of 55.  (Tr. 240).  He also opined that Claimant was unable to work at the present time and could be expected to demonstrate significant clinical improvement by May 2004.  (Tr. 240).  The ALJ considered these opinions of Dr. Pearl but chose to give his opinion as to Claimant's disability little weight, "as it is not supported by the detailed other medical evidence of the record."  (Tr. 20).  The ALJ also noted that "Mr. Pearl's own year and current GAF assessment do not support his disability opinion."  Id.  Finally, the ALJ noted that " the decision as to whether a claimant is disabled is reserved to the [Commissioner], and entirely inconsistent with assessments of Dr. Coder, his treating psychiatrist."  (Tr. 20-21).

This Court finds the ALJ's dismissal of Dr. Pearl's opinion it not supported by substantial evidence.  Despite the fact that Dr. Pearl's opinion as to Claimant being disabled is not entitled to controlling weight, see SSR 96 5-p, the ALJ nevertheless had a duty to evaluate the extent to which Dr. Pearl's opinion was supported by the medical evidence.  This Court finds that the medical record as a whole supports - or at a minimum does not contradict - Dr. Pearl's conclusions such that they should be dismissed by the ALJ.  For example, Dr. Coder evaluated

Claimant in November 2002 and diagnosed him with major depressive disorder, somatization disorder, autonomic nervous system dysfunction, considered obsessive personality disorder, and assigned Claimant a GAF of 31.[6] (Tr. 323). In March 2003 and again in September 2003, Dr. Coder concluded Claimant was not ready to return to work. (Tr. 364, 311). Dr. Elliot, in September 2004, said that although Claimant is physically capable of returning to work, "his anxiety and depression" have been holding him back for several months and referred the reader to Dr. Coder for a final determination of Claimant's mental status. (Tr. 354). In conclusion, the ALJ's evaluation of Dr. Pearl's opinion as being inconsistent with the entire medical record is not supported by substantial evidence and the case must be remanded for further consideration.

As to Dr. Feder's and Timms' reports, this Court finds the ALJ did not err by failing to mention these two reports in his decision. The ALJ is not required to make a written evaluation of every piece of evidence, so long as the ALJ articulates at some minimum level his analysis of a particular line of evidence. Green v. Shalala, 51 F.3d 96, 101 (7th Cir. 1995). In other words, while an ALJ may not "pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence," Hardman v. Barnhart, 362 F.3d 676, 618 (10th Cir. 2004), the ALJ's mere failure to cite specific evidence does not establish that he failed to consider it. Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998). Dr. Timms assessed Claimant's complaints of vertigo and numbness in his hands in October 2002 and concluded

---

[6] The Global Assessment of Functioning reports an individual's overall level of functioning. Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994). A GAF in the 31-40 range indicates "some impairment in reality testing or communication," or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." Id. at 34.

Claimant had "mild bilateral ulnar sensory nerve neuropathy" and "mild right carpal tunnel syndrome" but that his MRI and other tests were normal. (Tr. 214-20). Dr Feder's report, dated August 2002, established that Claimant may be suffering from an autonomic nervous system dysfunction but that his other hormone and blood levels were normal. (Tr. 211). This Court holds the ALJ was not required to mention these opinions, because the doctors' conclusions were not supported by substantial medical evidence in the record, see 20 C.F.R. § 416.972(d)(2); Evans, 734 F.2d 1012 (4th Cir. 1984). Nor were they "obviously probative exhibits" such that the ALJ had to document his consideration of them. See Arnold v. Secretary, 567 F.2d 258, 259 (4th Cir. 1977).

3.    Whether the ALJ Erred in Step Five of the Analysis by Failing to List All of Claimant's Impairments in the Hypothetical to the VE.

Claimant contends the ALJ failed to list all of Claimant's limitations in the hypothetical to the VE. Commissioner contends the ALJ's hypothetical accurately portrayed all of Claimant's impairments and limitations that were reasonably supported by the medical evidence.

During step five of the sequential analysis, the ALJ is responsible for reasonably setting forth all of Claimant's impairments in the hypothetical posed to the VE. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989); SSR 96-5p (1996). In other words, the hypothetical must "adequately reflected" a persons's impairments. Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005). However, the ALJ's hypothetical need only include those limitations supported by the record. Id. The limitations and impairments included in the hypothetical should reflect the Claimant's RFC, or the work a claimant is able to perform after considering that individual's physical and mental limitations that affect their ability to perform work-related tasks. 20 C.F.R. § 404.1545, SSR 96-

8p. A claimant's RFC is to be determined only after the ALJ has considered all the relevant medical evidence of the claimant's impairments as well as any subjective limitations alleged by the claimant.  Id. at § 404.1529(a); see, also, Hines v. Barnhart, 453 F.3d 559, 563 (4th Cir. 2006).  Subjective symptoms may be relied upon to the extent they are consistent with the objective medical evidence.  20 C.F.R. § 404.1529; SSR 96-7p.

The ALJ in the present case posed the following hypothetical to the VE: "Assume a younger individual with a high school education, precluded from performing all but light work, that is, entails no hazards or climbing, no temperature extremes, because of the knee, a sit/stand option, and due to mental health treatment, unskilled, low stress, defined as one and two-step processes, routine and repetitive tasks, primarily working with things rather than people, entry level."  (Tr. 610).  Claimant alleges the hypothetical fails to account for numerous limitations including his fatigue, mental limitations, limited finger use, blurred vision, dizziness, diminished coordination, neck pain, psychological impairments and pain near his post-op hernia sites.  This Court finds the ALJ's hypothetical adequately accounted for Claimant's physical and mental limitations.

As to physical limitations, the medical evidence failed to establish the existence of any physical limitations and therefore the hypothetical "adequately represented" Claimant's physical limitation.  See Johnson, 434 F.3d at 659; (Tr.  211, 214-22, 260, 354, 387, 487).  For example, Dr. Feder treated Claimant for his cold intolerance, fatigue and blurred vision and determined Claimant had normal hormone and blood levels.  (Tr. 211).  Similarly, Claimant's RFC Assessment in November 2004 showed no physical limitations.  (Tr. 487).  Furthermore, Dr. Elliot evaluated Claimant in September 2004 and noted Claimant was "potentially physically is

capable of returning to most of his regular activities at work." (Tr. 354).

The hypothetical also "adequately represented" Claimant's mental impairments. As established by the record, Claimant does suffer from various mental disorders and cognitive impairments. For example, Dr. Rush concluded that Claimant had a "substantial deficit" in his processing speed and cognition. (Tr. 281, 285). Additionally, both Dr. Pearl and Dr. Coder diagnosed Claimant with multiple mental impairments including major depressive disorder, somatization disorder, autonomic nervous system dysfunction, considered obsessive personality disorder. (Tr. 240, 323). Claimant was also assigned a GAF as low as 31. (Tr. 323). Finally, Claimant's anxiety and depression were well-documented and supported in the medical evidence. (Tr. 311, 323, 347, 354). By limiting his work to one to two step processes, to working with things rather than people and to unskilled, low stress work, the hypothetical adequately represented Claimant's impairments and limitations.

4.  <u>Whether the ALJ Improperly Evaluated Claimant's Credibility When Evaluating His Subjective Symptoms.</u>

Claimant generally alleges "the ALJ erred in finding him less than fully credible." While the Claimant does not provide any additional detail as to which representations of his should have been fully credited, this Court presumes Claimant intends to challenge the ALJ's discredit of his subjective symptoms and limitations (such as his temperature extremes, dizziness, slowness, knee pain) that allegedly prevent him from working. Commissioner contends the ALJ "specifically and properly" considered Claimant's subjective complaints. This Court agrees with Commissioner and holds the ALJ's determination of Claimant's credibility is supported by substantial evidence.

The Fourth Circuit stated the standard for evaluating a claimant's subjective complaints of

pain in Craig, 76 F.3d at 585. Under Craig, when a claimant alleges disability from subjective symptoms, he must first show the existence of a medically determinable impairment that could cause the symptoms alleged. Id. at 594. The ALJ must "expressly consider" whether a claimant has such an impairment. Id. at 596. If the claimant makes this showing, the ALJ must consider all evidence, including the claimant's statements about his symptoms, in determining whether the claimant is disabled. Id. at 595. While the ALJ must consider the claimant's statements, he need not credit them to the extent they are inconsistent with the objective medical evidence or to the extent the underlying objective medical impairment could not reasonably be expected to cause the symptoms alleged. Id. However, subjective symptoms "may not be dismissed merely because objective evidence of the pain itself . . . are not present to corroborate the existence of pain." Id.

The ALJ in the present case complied with the first step of Craig by expressly determining that Claimant has impairments that could cause some of the symptoms alleged. (Tr. 22). As the medical evidence established, Claimant potentially has a "autonomic nervous system dysfunction" and suffers from depression that manifests itself physically. (Tr. 211, 347). Dr. Pearl explained such physical manifestations may include knee pain, blurred vision, back pain, migraines. (Tr. 347). Accordingly, the ALJ's determination under step one of Craig is supported by substantial evidence.

In step two of the Craig analysis, the ALJ determined that while the medical evidence supported the existence of impairments capable of causing some of Claimant's symptoms, the record as a whole did not support the severity and frequency of symptoms alleged by Claimant. (Tr. 22). The ALJ particularly relied on the hearing testimony wherein Claimant established that he independently carries out his personal and household activities; socializes with his nephews;

attends sporting events; repairs items in his mother's house.  (Tr. 22, 82, 84, 594).  As a result of his findings under the <u>Craig</u> analysis, the ALJ concluded he would "not accept medical findings or opinions that are based solely or primarily on claimant's subjective complaints."  (Tr. 22). Because there was no significant medical evidence to support Claimant's reports of dizziness, slowness, temperature extremes or knee restrictions and his lifestyle testimony does not wholly support  his complaints, this Court finds the ALJ's evaluation of Claimant's credibility is supported by substantial evidence.

## IV.  Recommendation

For the foregoing reasons, I recommend that:

1.  Claimant's Motion for Summary Judgment be GRANTED and the case REMANDED because the ALJ's decision to discredit Dr. Pearl's reports and opinions is not supported by substantial evidence.

2.  Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

<u>DATED</u>: October 17, 2007

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE